HAASS & BROYLES EXCAVATORS, INC.

V.

RAMEY BROTHERS EXCAVATING COMPANY, INC.

Record No. 831926

April 24, 1987

Present: Carrico, C.J., Cochran,* Poff, Compton, Stephenson, Russell, and Thomas, JJ.

---

* Justice Cochran participated in the hearing and decision of this case prior to the effective date of his retirement on April 20, 1987.

*R. Terrance Ney (Thomas F. Farrell, II; Thomas H. Price, III; Boothe, Prichard & Dudley*, on brief), for appellant.

*J. William Gilliam (Gilliam, Sanders & Brown*, on brief), for appellee.

POFF, J., delivered the opinion of the Court.

We granted this appeal to review the trial court's decision that a general construction contractor was liable to its subcontractor for damages resulting from repossession of machinery sold to the

subcontractor by its creditor. The dispositive question is whether the evidence shows that the general contractor's failure to make a timely payment to the subcontractor's creditor pursuant to an assignment agreement was the cause of the repossession.

This controversy arose out of a construction project in Springfield. Haass & Broyles Excavators, Inc. (H & B), the general contractor, employed Ramey Brothers Excavating Company, Inc. (Ramey), to perform excavation and clearance work at the site. Under a subcontract executed August 16, 1982, the consideration was fixed at $30,000, and H & B promised Ramey "PAYMENT IN FULL UPON COMPLETION." Ramey engaged another subcontractor, Seneca Excavating and Landscaping Inc. (Seneca), to do some of the tasks it was unable to perform, and work began in August.

Ramey used a front-end loader, Model 977K (the 977K), which it had acquired the year before from Virginia Tractor Company, Inc. (Virginia Tractor). The contract of sale required Ramey to pay monthly installments of $1,649.19. Ramey was in arrears on these payments when it entered into the contract with H & B and needed the forbearance of Virginia Tractor in order to complete the project. On August 30, 1982, Ramey, H & B, and Virginia Tractor entered into an assignment agreement which provided in pertinent part as follows:

> This is to advise that $10,000.00 of the first draw and $10,000.00 of the final draw on [the Springfield project] is hereby assigned to Virginia Tractor . . . to be applied to accounts of *Ramey Excavating Co.* The fist [sic] draw is payable approximately September 25, 1982 and the final draw is payable approximately October 25, 1982.

About the same time, Ramey was negotiating with Virginia Tractor for the purchase of another front-end loader, Model 977L (the 977L).

On October 7, 1982, H & B issued its check for $10,000 payable jointly to Ramey and Virginia Tractor. Virginia Tractor applied a portion of the first draw to one of Ramey's overdue accounts and $8,107.20 to its 977K account. This constituted payment for the arrearages on that account and the October installment and a prepayment of nearly half the installment due for the month of November.

Ramey completed the excavation project and billed H & B on October 15, 1982 for the balance due under the subcontract. At that time, Ramey was delinquent in payments due Seneca, its subcontractor, and Seneca was threatening to perfect a lien on the property. On November 11, 1982, H & B issued a check payable jointly to Ramey and Virginia Tractor. Although the final draw contemplated by the assignment agreement was $10,000, H & B made the check for $4,064.51 and held the balance as "retainage".

Lee J. Ramey, Ramey's owner, testified that he offered the check to John Hazelgrove, then Virginia Tractor's vice president, and that Hazelgrove's response was, "I don't want it; I want $10,000." Consequently, the check was never negotiated and, after some delay, H & B instructed the bank to stop payment. Because the first $10,000 draw had brought the 977K account current through mid-November, no further payments would have been due on that account until January 1983 if Virginia Tractor had accepted the check and applied it to the 977K account.

For the months of September and October, Virginia Tractor billed Ramey a total of $12,604.80 for rental due on the 977L.[1] Ramey defaulted on these invoices, and Virginia Tractor repossessed that machine on November 8. Ramey's 977K account went into default for the last half of November and the month of December, and Virginia Tractor repossessed the 977K on January 14, 1983.

Four days later, H & B issued its check payable to Virginia Tractor for the final $10,000 draw. Although the repossession sale of the 977K had not yet been advertised, Virginia Tractor applied that payment to Ramey's 977L rental account and sold the 977K at auction on March 22, 1983. Without the use of the two machines, Ramey lost at least one opportunity to acquire another excavation contract.

When asked at trial why Virginia Tractor had credited the final draw to the 977L account rather than to the 977K account, Marvin Graham, Virginia Tractor's credit manager, replied that under the language of the assignment agreement there was "no restric-

---

[1] Ramey says on brief that it did not take possession of the 977L until September 30, 1982; but the lease/purchase contract lists the shipping date as August 31, 1982. In oral argument, Ramey contended that its rental obligation on the 977L did not begin until September 30; but the invoice shows that the monthly rental obligation commenced September 1. At trial, Ramey introduced both documents as exhibits in support of its claim.

tion on how we were to use that money." On cross-examination, Graham testified that even if H & B had paid the final draw in October when Ramey completed the excavation contract, he would have applied the $10,000 to the rental debt. He explained that, because Virginia Tractor "had no collateral" securing the 977L account, that account placed Virginia Tractor "in most jeopardy."

Following a bench trial, the court ruled that H & B had breached the contract by failing to make timely final payment to Virginia Tractor as required by the subcontract and assignment agreement. Relying in the judgment order upon "Lee J. Ramey's testimony that timely payments by [H & B] would have allowed him to save the loader" and finding that Graham's testimony was entitled to "little credence insofar as he asserted that he would have applied the second . . . payment in the same manner if the payment had been made on October 30, 1982", the trial judge awarded Ramey judgment for $26,124.27 for loss of equity in the 977K and certain profits lost on account of the repossession.

For purposes of this appeal, we assume that the evidence was sufficient to support the trial court's ruling that H & B's failure to pay the final $10,000 draw to Virginia Tractor and Ramey upon completion of the project constituted a breach of the subcontract.[2] H & B argues, however, that its delay in paying the final draw was "not the cause of Ramey's loss". Ramey incurred more debt in acquiring machinery than it could service, H & B reasons, and the proximate cause of the repossession of the 977K and the resulting damages was "Virginia Tractor's decision to apply the [second] $10,000 payment toward Ramey's arrearage on the 977L rather than the 977K".

 A plaintiff in an action *ex contractu*, like a plaintiff in an action sounding in tort, bears the burden of establishing a causal connection between the defendant's breach and the damages claimed.

[O]ne who violates his contract with another should generally be held responsible for all direct and proximate damages which result from such violation. . . . If [damages] are so remote as not to be directly traceable to that breach, *or are*

---

[2] But we observe again that Seneca had threatened to perfect a lien on the property to secure its claim against Ramey. Arguably, H & B was justified in tendering only part of the final draw and retaining the balance in order, if need be, to satisfy Seneca's claim.

*attributable to some other intervening cause*, then they cannot be allowed.

*Manss-Owens Co.* v. *Owens & Son*, 129 Va. 183, 202, 105 S.E. 543, 549 (1921) (emphasis added). The trial court's ruling was based upon Lee J. Ramey's testimony and upon the court's finding that Graham's testimony was entitled to little credence.

> A trier of fact must determine the weight of the testimony and the credibility of witnesses, but may not arbitrarily disregard uncontradicted evidence of unimpeached witnesses which is not inherently incredible and not inconsistent with facts in the record, even though such witnesses are interested in the outcome of the case.

*Cheatham* v. *Gregory*, 227 Va. 1, 4, 313 S.E.2d 368, 370 (1984). ■ Lee J. Ramey's statement that timely payment of the final draw would have saved the 977K was purely conclusory. On the other hand, Graham's testimony, never impeached, was fully consistent with and reinforced by the facts and circumstances revealed by this record. Graham said that he would have applied the second $10,000 payment to the 977L account even if he had received it in October rather than in January. The exhibits Ramey introduced show that, by October 15, Ramey's 977L account was $12,604.80 in arrears and Virginia Tractor was about to repossess that machine. Virginia Tractor was most in jeopardy on that account, and the assignment agreement, executed jointly by the obligor, the assignor, and the assignee, provided only that the payments "be applied to accounts of " Ramey. Such facts and circumstances contradict Ramey's conclusory statement and fully support Graham's testimony that any payment Virginia Tractor received from H & B in October would have been applied to the 977L account. Indeed, there was no occasion to do otherwise, because at that time, the 977K account was current through mid-November.

■ Even so, Ramey contends that, if H & B's check delivered to Virginia Tractor on January 18, 1983 had been made payable to Virginia Tractor and Ramey jointly, Ramey could have required Virginia Tractor to apply it to the 977K account and, thus, avert the auction sale and the attendant damages. This argument presupposes that H & B had a legal duty to include Ramey as a payee in the checks issued pursuant to the assignment agreement.

But the agreement did not so provide. Under that agreement, Ramey assigned all its interest in two-thirds of the subcontract price and reserved no right to control Virginia Tractor's application of the payments; H & B, as obligor and party to the assignment, was bound to pay the obligations otherwise due Ramey to Virginia Tractor; and H & B had no power to require Virginia Tractor to credit the funds to any particular account.

In our view, the record shows that the proximate cause of the repossession and sale of the 977K and the damages resulting therefrom was Virginia Tractor's application of the second $10,000 payment exclusively to Ramey's 977L account and not H & B's delay in making that payment. We hold, therefore, that the trial court's ruling was contrary to the evidence, and we will reverse the judgment and enter final judgment here in favor of H & B.

*Reversed and final judgment.*